❑ Original  ❑ D



CLERK'S OFFICE
A TRUE COPY
Sep 18, 2023
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  **23-M-450 (SCD)**
The premises located at 2810 West National Avenue, )
Milwaukee, Wisconsin, to include all associated common )
spaces, basement, garage, and outbuildings at this address )
)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before   10-2-23
_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ❑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Stephen C. Dries_____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*    ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:   9-18-23. 10:20 am

*Stephen C. Dries*
*Judge's signature*

City and state:   Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

**2810 West National Avenue, Milwaukee, Wisconsin**, to include all associated common spaces, basement, garage, and outbuildings at this address. This address is further described as the lower residence of a two-story duplex, with the upper residence identified as 2810 West National Avenue #A. The residence is made up of tan siding with white trim. 2810 West National Avenue can be accessed by two doors. There is a door on the front of the residence that faces South. There are two doors on the rear of the residence. If one is looking at the rear of the residence, the eastern most door (or the door to the left) is the access point for 2810 West National Avenue. This is the door case agents have observed MATTHAEUS entering with keys.

 

## <u>ATTACHMENT B</u>

### Property to be seized

1. Evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (Distribution of and possession with intent to distribute controlled substances), those violations involving Robert MATTHAEUS, including:

    a.    Controlled substances, controlled substance analogues, or listed chemicals;

    b.    Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

    c.    Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

    d.    Proceeds of drug and firearms trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

    e.    Firearms, ammunition, magazines, gun boxes, firearm purchase records or receipts, ledgers, and other paraphernalia associated with firearms;

    f.    Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances and firearms, or financial transactions related to the trafficking of controlled substances and firearms;

1

g.   Drug, firearms, or money ledgers, distribution or customer lists, supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances or firearms were obtained, transferred, sold, distributed, and/or concealed;

h.   Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug and firearms trafficking activities;

i.   Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

j.   Cellular telephones, Smartphones, text messaging systems, and other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug and firearms trafficking offenses;

k.   Records, items and documents reflecting travel for the purpose of participating in drug and firearms trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxicab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long-distance calls reflecting travel;

l.   Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or

2

rental agreements, addressed envelopes, escrow documents and keys;

m. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances; and

2. Computers, cellular telephones, or storage media used as a means to commit the violations described above;

3. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

c. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. evidence of the times the COMPUTER was used;

3

g.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.      records of or information about Internet Protocol addresses used by the COMPUTER;

j.      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.      contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of MATTHAEUS to the fingerprint scanner of a device found at the premises; and/or (2) hold a device found at the premises in front of MATTHAEUS' face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device to search the contents as authorized by this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Sep 18, 2023
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The premises located at 2810 West National Avenue,<br>Milwaukee, Wisconsin, to include all associated common<br>spaces, basement, garage, and outbuildings at this address | )<br>)<br>)<br>)<br>)<br>)     Case No.   23-M-450 (SCD) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the      Eastern      District of      Wisconsin     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☑ evidence of a crime;

    ☑ contraband, fruits of crime, or other items illegally possessed;

    ☑ property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of and possession with intent to distribute controlled substances. |
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm. |

The application is based on these facts:

See Attached Affidavit.

    ☑ Continued on the attached sheet.

    ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Allison Miller*

Digitally signed by Allison Miller
Date: 2023.09.15 14:55:29 -05'00'

*Applicant's signature*

Allison Miller, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:   9-18-23

*Judge's signature*

City and state:   Milwaukee, WI      Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A  WARRANT TO SEARCH AND SEIZE

I, Task Force Officer Allison Miller, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the premises located at 2810 West National Avenue, Milwaukee, Wisconsin, the **SUBJECT PREMISES**, more fully described in Attachment A, for the things described in Attachment B.

2.      I am a state certified law enforcement officer who is currently a federally deputized Task Force Officer (TFO) with Group 68 on the Drug Enforcement Administration (DEA) and assigned to the Drug and Gang Task Force with North Central High Intensity Drug Trafficking Area (HIDTA). I have worked full-time as a law enforcement officer for over fifteen years. Prior to working at North Central HIDTA, I was assigned to the West Allis Police Department Special Investigations Unit, which primarily investigates crimes involving narcotics trafficking and prostitution.

3.      I have received training in the investigation of drug trafficking through my assignments related to narcotics investigations for the West Allis Police Department. I have participated in several hundred narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, United States currency, and other evidences of criminal

1

activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, and court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers and money launderers.

4. I have worked with informants in the investigation of drug trafficking in the Milwaukee area. I have participated in search warrants, investigations, and arrests in which controlled substances, drug paraphernalia, and firearms were seized. I am familiar with the street names of various drugs in the Milwaukee area, including marijuana, ecstasy, heroin, fentanyl, and cocaine. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in the Milwaukee area.

5. I have also participated in investigations involving individuals engaged in the illegal possession and trafficking of firearms. More specifically, through my training and experience, I am aware that these individuals collect, use, and store firearms,

2

retain their used targets and spent casings, unlawfully possess and illegally carry firearms, and photograph themselves displaying firearms, which photographs I know to be kept in residences or places they exercise dominion and control, such as social media accounts. I have worked with local, state and federal law enforcement agents investigating the possession, use, and trafficking of controlled substances and weapons in the Milwaukee area, and I have participated in the execution of numerous search warrants in which weapons were seized.

6.      Through training and experience, I am familiar with the language used over the telephone, social media platforms, and third-party applications to discuss firearm and drug trafficking, and know that the language is often limited, guarded, and coded. I know that firearm and drug traffickers often use electronic equipment to conduct these operations. Furthermore, I know that firearm and drug traffickers often used social media applications, such as Facebook, to discuss firearm and drug sales.

7.      I have participated in multiple firearm and drug trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

8.      Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important

3

respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software which are (1) instrumentalities, fruits, or evidence of a crime, or (2) storage devices for information about crime.

9.     To this end, based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs. I also believe that it is common for crime suspects who possess illegal controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell.

10.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11.     Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

## PROBABLE CAUSE

12.     The Drug Enforcement Administration (DEA) and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) are conducting a criminal investigation of Robert J. MATTHAEUS regarding possible violations of 21 U.S.C. § 841(a)(1) (distribution of and possession with intent to distribute controlled substances), and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm). The evidence reveals that MATTHAEUS is involved in the trafficking of fentanyl and firearms.

13.     The investigation to date has included traditional law enforcement methods, including, but not limited to: interviews with confidential source(s) and source(s) of information; controlled purchases of narcotics; undercover purchases of firearms; documentary evidence; and physical surveillance.

14.     In January of 2023, a confidential informant informed case agents of an individual who possessed numerous firearms and trafficked fentanyl in Milwaukee County. The CI stated the individual is a white or Hispanic male that has a Facebook moniker of "Lilrob Lilrob." Case agents later viewed the Facebook page and observed a white male in the main profile picture that was in possession of a large amount of U.S. currency in his right hand and appeared to be a handgun with an extended magazine in

his left hand. The cover photo on the page depicted the same white male laying on a couch with a large amount of U.S. currency on his legs along with two handguns, one of which had an extended magazine. The listed date of birth for the individual that operated the Facebook page was found to be August 30, 1989. After a review of Milwaukee Police Department records of individuals with that date of birth, case agents located a Robert J. MATTHAEUS. The Milwaukee Police Department booking photograph matched the individual depicted in the photographs on the "Lilrob Lilrob" Facebook page. Case agents later showed the CI a booking photograph of MATTHAEUS, and the CI positively identified MATTHAEUS as the individual in possession of numerous firearms and trafficking fentanyl in Milwaukee County.

15.    Beginning in August of 2021, the CI made statements against the CI's penal interest. The CI has multiple drug-related convictions, to include trafficking convictions, and two firearm related convictions. The CI is cooperating in exchange for consideration regarding criminal charges that have yet to been issued in the State of Wisconsin. Thus far, the information provided by the CI has been corroborated by information known to case agents and by controlled purchases of narcotics. The CI's information has also been corroborated by digital evidence contained on the CI's cell phone such as text messages and social media conversations. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe the CI is credible and the CI's information reliable.

16.    Case agents conducted a search of the Milwaukee County Circuit Court

system of MATTHAEUS and found that MATTHAEUS is a convicted felon as a result of three Milwaukee County cases. *See State of Wisconsin v. Robert Jeffrey Matthaeus*, Milw. Cty. Case No. 2009CF000444 (Vehicle Operator Fleeing and Eluding); *State of Wisconsin v. Robert Jeffrey Matthaeus*, Milw. Cty. Case No. 2009CF005193 (Possession of a Firearm by a Felon); and *State of Wisconsin v. Robert Jeffrey Matthaeus*, Milw. Cty. Case No. 2018CF000415 (Felony Retail Theft). As a result of these convictions, MATTHAEUS is unable to possess firearms. The CI has known MATTHAEUS for approximately five years and has always known MATTHAEUS to possess numerous firearms.

17. According to the CI, in the past, the CI supplied MATTHAEUS street-level amounts of fentanyl that MATTHAEUS sold to other individuals. The CI further stated that the CI purchased ounce-level quantities of fentanyl from MATTHAEUS on one or two instances because the CI's source was out of fentanyl. The CI and MATTHAEUS stopped talking for approximately one year. However, the CI and MATTHAEUS began to communicate over Facebook and telephone beginning in approximately January 2023. The CI provided MATTHAEUS' cell phone number to be 414-933-6685 (TARGET TELEPHONE). MATTHAEUS told the CI that he (MATTHAEUS) could supply fentanyl to the CI fentanyl because MATTHAEUS was being sourced by a high-level trafficker that traveled between Milwaukee and Chicago, Illinois. MATTHAEUS identified the supplier by nickname as "Mal."

18. On January 8, 2022, the CI met with MATTHAEUS and "Mal" near the area of South 9th Street and West Lapham. The CI stated that "Mal" was driving a silver Dodge

Durango bearing Illinois registration plates of 100939PV (TARGET VEHICLE), and MATTHAEUS was the front passenger. The CI stated that "Mal" was in possession of a clear plastic bag that contained a large amount of fentanyl. The CI stated that "Mal" told the CI it was 100 grams and that the CI could purchase the fentanyl from him ("Mal"). "Mal" also had a black handgun on his lap while speaking with the CI. The CI told MATTHAEUS and "Mal" that the CI would purchase a quantity of fentanyl from them at a later time. Case agents conducted a DOT check of the TARGET VEHICLE and found it to be a silver 2012 Dodge Durango, and the registered owner was Jamal HARRIS. A search of law enforcement records returned a result for a Jamal HARRIS (DOB: xx/xx/1987) from Chicago, Illinois. Case agents located a booking photograph of HARRIS and showed it to the CI. The CI positively identified HARRIS as "Mal."

### *Controlled Purchase of Fentanyl from MATTHAEUS and HARRIS*

19.     Throughout the course of the investigation, case agents have conducted a controlled buy. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from the target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The

8

informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. The above-stated standard controlled buy protocols were followed during all controlled buys.

20.     On or about January 12, 2023, case agents met with the CI to conduct a controlled purchase of fentanyl from MATTHAEUS and HARRIS. The CI conversed with MATTHAEUS between January 11, 2023, and January 12, 2023, through text message on the TARGET TELEPHONE to set up the purchase of fentanyl. On January 12, 2023, in the presence of case agents, the CI called the TARGET TELEPHONE to speak with MATTHAEUS about the transaction. MATTHAEUS stated that "he" (presumably HARRIS) would be picking MATTHAEUS up at 2:00 p.m. MATTHAEUS stated, "…cause he was coming from the North side to grab me." Agents conducting surveillance observed HARRIS pick MATTHAEUS up from his residence located at 1625 East Norwich Avenue, St. Francis, Wisconsin.

21.     At 2:15 p.m. the CI left the meet spot and was followed to the transaction meeting spot at 1574 South 9th Street. At 2:22 p.m., the CI arrived in the area of the meet spot. At 2:23 p.m., the CI parked the CI's vehicle, exited, and entered the rear passenger side of the TARGET VEHICLE. At 2:25 p.m., the CI was observed getting out of the TARGET VEHICLE and re-entering the CI's vehicle. At 2:26 p.m., the CI and the TARGET VEHICLE left the area. The CI was followed back to a pre-determined meet spot.

9

22.     Case agents then conducted a follow of the TARGET VEHICLE. The target vehicle was followed back to MATTHAEUS' residence located at 1625 East Norwich Avenue, and MATTHAEUS was observed re-entering the residence through the side door. The TARGET VEHICLE was followed for a short time before case agents lost sight of the vehicle in the area of South 5th Street and West National Avenue.

23.     At 2:33 p.m., case agents met with the CI. The CI provided case agents a clear plastic bag that contained a white substance that was in brick form. The CI further provided case agents with a small clear plastic corner cut bag that contained a brown rock-like substance. The CI stated that upon entering the TARGET VEHICLE, HARRIS was the driver and MATTHAEUS was the front passenger. The CI stated that he gave MATTHAEUS the pre-recorded U.S. currency that was provided by law enforcement and that MATTHAEUS quickly counted the money before giving the money to HARRIS, who then re-counted the money. MATTHAEUS then gave the CI the clear plastic bag that contained the white substance in brick form. After a brief conversation, HARRIS gave the CI the clear plastic corner cut bag with the brown rock-like substance. The CI believed this substance to be a tester in the hopes that the CI would later buy the substance from HARRIS. HARRIS then asked the CI when the CI would be ready to purchase more, and the CI told HARRIS the CI would be ready in a few days.

24.     Case agents then reviewed the audio/visual recording, which verified the CI's statements. During the video, HARRIS and MATTHAEUS can be clearly observed as the driver and front passenger, respectively. The CI was observed giving

Case 2:23-mj-00450-SCD    Filed 09/18/23    Page 19 of 63    Document 1

MATTHAEUS the U.S. currency, who then gave it to HARRIS. MATTHAEUS was further observed giving the clear plastic bag that contained the white substance in brick form to the CI.

25.     Case agents later subjected the white substance in brick form to the Nark II 33 field test. The substance tested positive for the presence of fentanyl and had a total weight of approximately 24.9 grams. Case agents further subjected the brown rock-like substance to the Nark II 33 field test, and it tested positive for the presence of fentanyl with the Nark II 33 field test and weighed 0.74 grams.

26.     On or about February 2, 2023, case agents met with a CI to conduct a controlled purchase of fentanyl from MATTHAEUS and HARRIS. The CI was instructed by case agents to contact MATTHAEUS on the TARGET TELEPHONE on February 1, 2023, to arrange the purchase of two ounces (50 grams) of fentanyl. This phone call was not made in the presence of case agents. On February 2, 2023, the CI placed a recorded phone call to the TARGET TELEPHONE. MATTHAEUS consented to the deal and told the CI that he (MATTHAEUS) was in the area of 9th and Lapham.

27.     Thereafter, case agents observed the TARGET VEHICLE park in front of 1571 South 9th Street. At approximately 1:23 p.m., the CI arrived to meet with MATTHAEUS and HARRIS in the TARGET VEHICLE. The CI was observed exiting the CI's vehicle and entering the TARGET VEHICLE. At approximately 1:26 p.m., the CI exited the TARGET VEHICLE and returned to the CI's vehicle. The CI and the TARGET VEHICLE then left the area. The CI was followed back to a pre-determined meet spot.

28.     Case agents then conducted a follow of the TARGET VEHICLE. The TARGET VEHICLE was followed back to MATTHAEUS' residence at 1625 East Norwich Avenue, and MATTHAEUS was observed entering the residence through the side door. Of note, before the controlled purchase occurred, agents conducting surveillance observed MATTHAEUS leave his residence before the buy occurred.

29.     At 1:37 p.m., case agents met with the CI. The CI provided case agents a clear plastic bag that contained a white substance that was in brick form. The CI said the CI entered the backseat of the TARGET VEHICLE. The CI gave the $3,000 in pre-recorded buy money to MATTHAEUS and MATTHAEUS subsequently gave it to HARRIS. HARRIS then gave the suspected fentanyl directly to the CI. HARRIS told the CI that he was going to be in Milwaukee until tomorrow and had another 50 grams. HARRIS asked if the CI had anyone else that would want to buy it for a lower price of $55 per gram.

30.     After the controlled purchase of fentanyl, case agents reviewed the audio/visual recording, which verified the CI's statements. During the video, HARRIS[1] and MATTHAEUS can be clearly observed as the driver and front passenger, respectively.

_____

[1] Case agents learned that on July 10, 2023, HARRIS was shot and killed while standing outside of his silver Dodge Durango in Chicago, Illinois.

12

31.     Case agents later subjected the white substance in brick form to the Nark II 33 field test. The substance tested positive for the presence of fentanyl and had a total weight of approximately 49.87 grams.

**MATTHAEUS Uses Facebook to Sell Firearms**

32.     In November 2022, an undercover ATF Special Agent (hereinafter referred to as the "UC") became Facebook friends with MATTHAEUS on Facebook through MATTHAEUS account, "Lil Rob Lil Rob," the Target Account. On January 24, 2023, MATTHAEUS commented on one of the UC's Facebook photographs and also sent the UC a direct message via Facebook's messaging platform, Facebook Messenger. Referencing the UC's photograph, which contained an image of three handguns and a box of ammunition, MATTHAEUS asked the UC if the "P89" was for sale. A P89 is the model of one of the handguns depicted in the UC's photograph. The UC informed MATTHAEUS that the firearm he (MATTHAEUS) was referencing had previously been sold, but the UC would attempt to obtain another handgun of the same make and model for MATTHAEUS. The UC and MATTHAEUS continued to communicate sporadically via Facebook Messenger over the next several months.  Unless otherwise noted, all referenced communications between the UC and MATTHAEUS occurred between the UC's undercover Facebook account and the Target Account.

33.     On July 6, 2023, MATTHAEUS posted a "Story" to the profile of the

13

Target Account that stated MATTHAEUS had a "Ghost" for sale.[2] The UC, knowing through training and experience that the term "Ghost" refers to a "ghost gun" and is commonly used in street vernacular to reference a Privately Made Firearm ("PMF"), replied to MATTHAEUS' story. THE UC asked what variation of PMF MATTHAEUS was attempting to sell. MATTHAEUS replied, "Tan n [and] black with a gold barrow [barrel] it's raw." The UC informed MATTHAEUS that the UC was interested in purchasing the firearm; however, when MATTHAEUS later responded, MATTHAEUS stated he (MATTHAEUS) was unable to obtain the firearm from the actual possessor, stating, "Ghost gone already bro n FN not for sale lol."

34.     Continuing on July 6, 2023, MATTHAEUS offered to sell "pounds" of marijuana to the UC. MATTHAEUS then sent the UC multiple videos of suspected marijuana and marijuana wax. The UC stated they would be interested in purchasing marijuana from MATTHAEUS in the future.

35.     Over the next several weeks, the UC and MATTHAEUS engaged in conversation regarding the possession and trafficking of firearms. On July 17, 2023, MATTHAEUS informed the UC another firearm was for sale; however, MATTHAEUS was once again unable to obtain the firearm he intended to sell to the UC.

36.     On July 18, 2023, MATTHAEUS sent the UC ten separate photographs

---

[2] Facebook Stories are short user-generated photo or video collections that can be uploaded to the user's Facebook. The Facebook Story a user posts will only be viewable for 24 hours. Users can also limit privacy settings with respect to what audience can view the user's Facebook Story.

depicting more than twenty firearms. *See Figure 1*. MATTHAEUS stated he has a firearms "fetish," and that between himself and his son, MATTHAEUS possessed a "crazy [gun] collection."



*Figure 1*
*Two of the photographs sent by MATTHAEUS using the Target Account to the UC*

37.     The UC then asked MATTHAEUS if he (MATTHAEUS) would be interested in selling any of the firearms in MATTHAEUS' personal collection. MATTHAEUS stated he would not sell any of the firearms in his personal collection; however, MATTHAEUS would sell the UC other firearms that were available to MATTHAEUS.

38.     Investigators reviewed the photographs that MATTHAEUS sent to the UC and identified MATTHAEUS' firearms consisted of AR-style rifles/pistols, AK-style rifles/pistols, and a variety of other rifles and handguns. Investigators also observed in several photographs, MATTHAEUS' firearms were pictured beside numerous high-

15

capacity magazines that were compatible with the photographed firearms.

**First Undercover Firearms Purchase on August 7, 2023**

39.     On August 3, 2023, the UC messaged MATTHAEUS via the Target Account using Facebook Messenger, asking if MATTHAEUS had any marijuana available for purchase. MATTHAEUS had previously offered to sell the UC marijuana, marijuana wax, and Xanax bars via Facebook Messenger. MATTHAEUS responded shortly thereafter, stating he (MATTHAEUS) possessed "Just lil personal shit got like 20 grams of some just regular loud nothing special but I can get it w/e u want." Through training, experience, and familiarity with this investigation, the UC understood MATTHAEUS' message to mean MATTHAEUS did not possess large quantities of marijuana at that time, but MATTHAEUS could obtain additional amounts of marijuana for the UC. The UC informed MATTHAEUS that the UC had wanted to purchase approximately 1 to 2 ounces of marijuana from MATTHAEUS on this date, but the UC was content with waiting to purchase these items the following week. The UC also informed MATTHAEUS that the UC was interested in purchasing firearms from MATTHAEUS. MATTHAEUS responded, "Just lmk [let me know] so I'll have some fire smoke set up for u maybe few heats too." Based on their training, experience, and familiarity with this investigation, case agents know that when MATTHAEUS referred to "fire smoke," he was referring to marijuana and that "heats" is a term commonly used in street vernacular to refer to firearms. Therefore, investigators believed MATTHAEUS informed the UC that MATTHAEUS would sell marijuana to the UC and, if he had any

16

firearms, he would sell them to the UC too.

40.     On August 6, 2023, the UC contacted MATTHAEUS via Facebook Messenger, informing MATTHAEUS that the UC would be in the Milwaukee area the following day (August 7, 2023). MATTHAEUS responded, "Ok bet tmro imma work on seeing if there any steal [steel] around 4 you." Based on their training and experience, investigators know that "steel" is a term commonly used in street vernacular to refer to firearms. Investigators further believe that MATTHAEUS informed the UC that he was going to try and sell a firearm to the UC the next day ("tmro," meaning tomorrow).

41.     On August 7, 2023, beginning at approximately 12:55 p.m., MATTHAEUS messaged the UC on Facebook Messenger, stating he (MATTHAEUS) could arrange the sale of several firearms to the UC. One of the firearms offered by MATTHAEUS was also equipped with a "suppressor," which MATTHAEUS confirmed was a "real silencer" due to the fact that the firearm "sounds like a point ball gun" when the silencer was affixed to the firearm's barrel. MATTHAEUS also stated he was in the process of obtaining marijuana that MATTHAEUS intended to sell to the UC during the same transaction.

42.     At approximately 2:15 p.m., MATTHAEUS informed the UC that he (MATTHAEUS) did not have a vehicle to obtain all of the firearms and marijuana previously discussed with the UC; therefore, MATTHAEUS' "cuz [cousin]" would have to obtain the firearms for MATTHAEUS. Furthermore, because MATTHAEUS needed a third-party (MATTHAEUS' cousin) to pick up the firearms for him (MATTHAEUS), MATTHAEUS would only be able to obtain and sell the UC two firearms, one Ruger

17

"5.7" and one Taurus "G2." Regarding the additional firearms that MATTHAEUS had offered to sell to the UC earlier that day, MATTHAEUS stated, "And yes all the other 1s [firearms] u don't grab should be around plus more next time u come…" MATTHAEUS later informed the UC, via the Target Account, that he (MATTHAEUS) would charge the UC $1,650 for the two aforementioned handguns. The UC and MATTHAEUS ultimately agreed to meet at a public meeting location near the intersection of South 27th Street and National Avenue in Milwaukee at approximately 4:30 p.m. to conduct the transaction.

43.     At approximately 4:34 p.m., the UC departed the operation's staging location in an undercover vehicle (UCV) and traveled towards Family Dollar located at 729 South Layton Avenue, Milwaukee, Wisconsin, a business located on the northwest corner of the intersection of South 27th Street and National Avenue. The UC was equipped with audio-/video-transmitting/recording devices as well as an amount of ATF Agent Cashier Funds (U.S. Currency; hereinafter "ACF"). During the entirety of the undercover operation, the UC was followed by a designated cover team.

44.     At approximately 4:42 p.m., the UC messaged MATTHAEUS on Facebook Messenger, informing MATTHAEUS that the UC would soon be arriving at the meet location. At approximately 4:44 p.m., MATTHAEUS responded, stating he (MATTHAEUS) was waiting for his cousin to give him a ride to the meet location, and that his cousin was "2-3 min" away. At approximately 4:45 p.m., the UC arrived at Family Dollar and parked in front of the business within a large parking lot.

45.     At approximately 4:51 p.m., the UC observed a white Toyota sedan,

18

occupied by three males, enter Family Dollar's parking lot and circle the UCV. At approximately 4:52 p.m., the Toyota sedan parked beside the UCV on the UCV's passenger side before one of the occupants on the passenger side of the Toyota exited the vehicle holding a black backpack with a red and white logo. This passenger, later identified as J. V., then approached the UCV and entered the front passenger seat with the backpack.

46.     After J. V. entered the UCV, the UC and J. V. exchanged introductions. J. V. identified himself as "Jay" and confirmed he was the "blood cousin" of MATTHAEUS. J. V. then retrieved two firearms from the black backpack, which J. V. had placed between his legs. J. V. displayed the firearms for the UC to examine and then set both firearms on the front middle seat between himself and the UC. The UC examined the firearms and asked if the price for both firearms would be "sixteen," believed to mean $1,600. J. V. paused for a moment and then corrected the UC when he (J. V.) stated, "sixteen fifty," meaning $1,650. Because J. V. was aware how much MATTHAEUS intended to charge the UC for the two firearms ($1,650), the UC understood this to mean MATTHAEUS had discussed the details of the transaction with J. V. prior to J. V.'s arrival.

47.     The UC then counted $1,800 in ACF and handed the funds to J. V. The UC explained that the additional $150 (on top of the $1,650) was being given to J. V. because the UC appreciated "good business." J. V. then counted the ACF provided to him by the UC and confirmed the amount provided to him was $1,800. The UC then again inspected the two firearms provided by J. V. and identified the firearms as follows:

19

a. a Taurus .40 caliber pistol, Model: G2C, bearing Serial No. ACE863047; and

b. a Ruger 5.7x28mm caliber pistol, Model Ruger 5-7, bearing Serial No.: 64374508.

48.     The UC then inspected the magazines and chambers of the firearms and identified the Taurus G2C pistol was loaded with five rounds of .40 caliber ammunition within the firearm's magazine.

49.     At approximately 4:58 p.m., the UC received an incoming voice call from MATTHAEUS via Facebook Messenger. MATTHAEUS asked the UC if they had just met with MATTHAEUS' cousin (J. V.) and/or provided MATTHAEUS' cousin with any money. The UC informed MATTHAEUS that the UC had just purchased the two firearms from J. V. for $1,800. MATTHAEUS informed the UC that J. V. had cut MATTHAEUS out of the transaction, stating he (MATTHAEUS) had arrived at Family Dollar parking lot when the transaction between the UC and J. V. had just concluded. MATTHAEUS continued, stating he witnessed J. V. exit the UCV and drive off at the same time the UCV had driven off in the opposite direction. MATTHAEUS further explained that when MATTHAEUS approached J. V.'s vehicle (white Toyota), J. V. had flipped his finger up at MATTHAEUS as the driver of the white Toyota and continued to drive away.

50.     The UC, addressing what MATTHAEUS had just informed them, stated they did not fully understand what had transpired between J. V. and MATTHAEUS prior to the UC's transaction with J. V. MATTHAEUS stated J. V. had "run off" with MATTHAEUS' money without providing MATTHAEUS with any of the $1,800 provided

20

to J. V. by the UC. In this context, the UC understood this to mean MATTHAEUS and J. V. had agreed to divide the profit made from the firearms transaction with the UC amongst themselves; however, J. V. did not honor this agreement with MATTHAEUS. Rather, J. V. kept the entire $1,800 for himself. MATTHAEUS then stated, in substance, that the issue was between MATTHAEUS and J. V., and the UC was not at fault.

**Second Undercover Firearms Purchase on August 14, 2023**

51.     On August 8, 2023, MATTHAEUS messaged the UC via the Target Account on Facebook Messenger, "Another G2 9 for $550 bro." In this context, the UC understood MATTHAEUS' message to mean MATTHAEUS was offering to sell the UC a Taurus G2 pistol, chambered in 9mm, for $550. The UC informed MATTHAEUS that the UC was interested in purchasing this firearm but would not be able to purchase the firearm until the following week.

52.     On August 13, 2023, the UC informed MATTHAEUS via Facebook Messenger that the UC would be able to purchase the aforementioned Taurus G2 pistol, referenced by MATTHAEUS on August 8, 2023, the following day. MATTHAEUS responded, "The G2 will be around for sure tmro gonna see what else for u tho bro might be a Glock too so I'll luk asap." Based on training, experience, and familiarity with this investigation, investigators know that MATTHAEUS stated that he could sell a Taurus G2 pistol ("G2") the following day ("tmro"), and that MATTHAEUS may be able to sell another Glock and would let the UC know ("luk," meaning let you know).

53.     On August 14, 2023, beginning at 9:24 a.m., the UC and MATTHAEUS

21

began discussing the firearms transaction that was anticipated to occur later that date. The UC and MATTHAEUS ultimately agreed to meet at approximately 2:30 p.m. in Milwaukee, Wisconsin. MATTHAEUS informed the UC that in addition to the Taurus G2 pistol, MATTHAEUS had a Glock 43 with "extra extendos," which are high-capacity magazines, that the UC could purchase for $950. The UC agreed to purchase the Glock 43 pistol and then asked if MATTHAEUS had any "work." The UC knows through training and experience that "work" is a term commonly used in street vernacular to refer to illegal drugs (i.e., cocaine and fentanyl). MATTHAEUS replied, stating he could sell the UC marijuana once MATTHAEUS obtained additional amounts of the controlled substance from MATTHAEUS' marijuana source of supply. MATHAEUS ultimately offered to sell one-half ounce of marijuana (~14 grams) to the UC for $100. MATTHAEUS explained the marijuana he would sell to the UC was "exotic" and MATTHAEUS' marijuana source "gets his shit thru my ppl so gonna be some zaza," which investigators believe to mean is high-quality marijuana.

54.     On August 14, 2023, at approximately 2:30 p.m., the UC departed the operational staging location in a UCV and traveled towards the intersection of 27th Street and National Avenue, which is where MATTHAEUS asked the UC to meet. The UC was equipped with audio-/video-recording/transmitting equipment and an amount of ACF. Additionally, the UC was followed by a designated cover team during the entirety of the operation. At approximately 2:44 p.m., the UC arrived at Family Dollar, which is located on the northwest corner of the intersection of South 27th Street and National Avenue. The

22

UC parked the UCV in Family Dollar's parking lot and then placed an outgoing audio call to MATTHAEUS at the Target Account using Facebook Messenger. Upon the call being connected, MATTHAEUS informed the UC that MATTHAEUS would be arriving at Family Dollar within the next several minutes.

55. At approximately 2:51 p.m., a white Infiniti entered the Family Dollar parking lot before parking directly next to the UCV's passenger side. The UC then observed MATTHAEUS, clutching a black plastic bag, exit the white sedan's front passenger seat and walk towards the UCV. MATTHAEUS proceeded to enter the UCV's front passenger seat and exchanged greetings with the UC. MATTHAEUS introduced himself to the UC as "Rob" before he produced a Glock 43x pistol that consisted of a light green frame with a black slide, a knotted-off plastic baggie with 9mm ammunition, three Glock 43x magazines, and a knotted-off plastic baggie containing a green leafy substance (suspected marijuana) from the black plastic bag. *See* Figure 2. MATTHAEUS informed the UC that he (MATTHAEUS) was unable to obtain the Taurus G2 pistol that he had discussed with the UC earlier on Facebook Messenger due to the fact that the individual who possessed the Taurus G2 pistol had not responded to MATTHAEUS' calls and/or text messages before the UC's arrival.

Case 2:23-mj-00450-SCD   Filed 09/18/23   Page 32 of 63   Document 1



*Figure 2*
*Screenshot from the recordings capturing MATTHAEUS in the process of providing the Glock 43x (left) and suspected marijuana (right) to the UC.*

56. MATTHAEUS confirmed that the price for the Glock 43x was $950 and the price for the half-ounce of marijuana was $100. MATTHAEUS asked if the UC wanted the 9mm ammunition and spare magazines MATTHAEUS had brought, to which the UC affirmed. The UC asked MATTHAEUS if the suspected marijuana weighed one-half ounce, to which MATTHAEUS affirmed.

57. The UC then stated since MATTHAEUS' cousin, J. V., had not shared the profit made from J. V.'s sale of two firearms to the UC on August 7, 2023, the UC was providing MATTHAEUS with an extra $150 (total of $1,200) as a showing of good faith/business. The UC then counted out $1,200 in ACF before handing the funds to MATTHAEUS. *See* Figure 3. The UC requested MATTHAEUS count the ACF to ensure he (MATTHAEUS) had been provided with the correct amount. MATTHAEUS counted the money and confirmed the amount the UC had provided was $1,200. MATTHAEUS stated he appreciated the UC's generosity and explained he (MATTHAEUS) had felt cheated by J. V. since MATTHAEUS had coordinated and arranged the sale of the two

24

firearms to the UC on August 7, 2023.



*Figure 3*
*Screenshot from the recordings capturing MATTHAEUS receiving the ACF (circled in red)*

58.     The UC then asked MATTHAEUS if he (MATTHAEUS) no longer had access to "the work" since MATTHAEUS' fentanyl source of supply had been recently killed. MATTHAEUS had previously disclosed to the UC that MATTHAEUS' fentanyl source had recently been killed in a drug-related homicide. Responding to the UC's question, MATTHAEUS stated, "I was selling fentanyl... I was supposed to start talking to his [HARRIS'] brother again, but I never dealt with him, and he's talking about where we [MATTHAEUS and HARRIS] left off. So shit I don't know how serious he is and I never called him back." MATTHAEUS then stated, "My guy that was buying a lot of that shit too, he would come to me and buy 100. 200 grams of the crack. He just got out. I seen he's on the bracelet though. So, I'm giving him a couple days, I'm gonna get back in touch with him too though." Case agents believe that during this exchange, MATTHAEUS informed the UC that he was supposed to start discussing buying fentanyl from his previous fentanyl source's brother, but that has not yet happened. MATTHAEUS further stated that his guy that bought a lot of fentanyl ("a lot of that shit") just got released from

25

incarceration ("just got out") and is on GPS monitoring ("he's on the bracelet"), so MATTHEAUS was giving that guy a couple of days before getting back in touch.

59.     At approximately 3:01 p.m., MATTHEAUS and the UC exchanged goodbyes and MATTHAEUS returned to the white sedan, which had remained parked in the same place while MATTHEAUS was in the UCV. After MATTHAEUS departed in the white Infiniti sedan, surveillance personnel participating in the operation conducted mobile physical surveillance and followed MATTHAEUS. After the second occupant of the white Infiniti was dropped off at a residence near 655/657 South 29th Street in Milwaukee, surveillance personnel observed MATTHAEUS drive to, park at, and enter the **SUBJECT PREMISES**.

### Third Undercover Firearms Purchase on August 22, 2023

60.     On August 18, 2023, MATTHAEUS messaged the UC stating that he may have an "AR" for the UC to purchase. The UC understood this to refer to an AR-style firearm. On August 21, 2023, the UC messaged MATTHAEUS via Facebook Messenger indicating that the UC would be ready to meet the following day. On August 22, 2023, at approximately 1:11 p.m., MATTHAEUS sent a Facebook message to the UC indicating that the guy with the AR never got back to him but that he (MATTHAEUS) could get the UC "a Glock 43x like the other I u bought but it's brand new all black not painted like the other 1 for 1,000 n there a FN 9mm with the threaded barrel for 12 [$1,200] them 2 are for sure dude wit AR n G2 not answering yet." The UC understood MATTHAEUS' message to mean that MATTHAEUS could sell the UC a Glock 43x pistol for $1,000 and an FN

26

pistol, chambered in 9mm, for $1,200. The UC responded and stated the UC would purchase both firearms, as well as the AR and the G2 if MATTHAEUS could obtain them.

61.　　　MATTHAEUS requested that the UC meet at the intersection of 28th Street and National Avenue. At approximately 2:30 p.m., the UC departed the operation's staging location in a UCV and traveled to the meeting location. Upon arrival, the UC parked in the BMO Harris Bank parking lot. At approximately 2:39 p.m., MATTHAEUS approached the UCV on foot from 28th Street and entered the UCV. Once inside, MATTHAEUS told the UC that his cousin had the Glock 43x and the FN 9mm pistol and they would have to meet the cousin at the cousin's house near 8th and Burnham Streets. MATTHAEUS confirmed that this cousin was not J.V.; it was a different cousin.

62.　　　The UC and MATTHAEUS arrived to the intersection of 8th and Burnham Streets and parked. After MATTHAEUS made a phone call, he observed his cousin's vehicle arrive to the area and asked the UC for $1,000 to purchase the Glock 43x pistol. MATTHAEUS counted the money, exited with it, and entered his cousin's vehicle a short distance away. At approximately 2:58 p.m., MATTHAEUS exited his cousin's vehicle and returned to the UCV, at which time he produced a Glock 9mm, Model 43x, bearing Serial No. BXKR449, with a magazine inserted into the magazine well, and gave it to the UC. MATTHAEUS also removed suspected marijuana from his shorts pocket and explained to the UC that he (MATTHAEUS) was provided the marijuana as payment for the firearms transaction.

63.　　　Subsequently, MATTHAEUS directed the UC to drive back to the

27

**SUBJECT PREMISES** because another individual was going to meet them there to sell a Taurus G2 pistol to the UC. While waiting for the third-party seller, MATTHAEUS told the UC that he previously resided on Milwaukee's north side and at that time he was involved in a shooting in which he shot two individuals. MATTHAEUS further stated that he received approximately 100 grams of fentanyl on a weekly basis from HARRIS, which he then distributed. The parties waited for the third-party seller until approximately 4:03 p.m., at which time the UC stated the UC had to leave. MATTHAEUS then exited the UCV and walked down an alley that ran behind the **SUBJECT PREMISES**, which he had earlier pointed to and stated, "I stay right here, bro."

### Fourth Undercover Firearms Purchase on August 31, 2023

64.     On August 24, 2023, MATTHAEUS contacted the UC via Facebook Messenger, stating he (MATTHAEUS) had spoken to his "cuz" (J. V.). MATTHAEUS explained that J. V. possessed multiple firearms that could be purchased by the UC, through MATTHAEUS. The UC responded on the same date, informing MATTHAEUS that J. V. had already contacted the UC directly, having offered to sell the UC at least one firearm, described by J. V. to be a Glock 19 pistol with binary trigger. The UC knows through training and experience that a binary trigger is a modification that allows a weapon to fire one round when the trigger is pulled and another when it is released. MATTHAEUS responded, "Yea don't fuckwit him [J. V.] bro go thru me he be on Shiesty shit." The UC agreed to purchase any firearms offered to them by J. V. through MATTHAEUS. MATTHAEUS later provided the UC with his (MATTHAEUS') personal

28

telephone number, 414-933-6685 (the TARGET TELEPHONE), and stated the UC could contact MATTHAEUS at this number if MATTHAEUS was not available via Facebook Messenger.

65. Continuing on August 24, 2023, MATTHAEUS messaged the UC on Facebook Messenger, stating MATTHAEUS could sell the UC the following firearms: a Glock 19 pistol with binary trigger for $1400, a Sig Sauer pistol for $900, and an unknown make/model firearm chambered in .22 caliber for $800. MATTHAEUS then sent the UC photographs of the aforementioned firearms to the UC. *See* Figure 4.



*Figure 4*
*Screenshot of the photographs sent by MATTHAEUS to the UC via Facebook Messenger*

66. At approximately 6:29 p.m., the UC texted MATTHAEUS' phone number, identifying the number as the UC's so that MATTHAEUS would also have the UC's telephone number. MATTHAEUS responded shortly thereafter stating, "Bet gonna lock

29

u in," and then asking, "Wen u planon coming back so can have everything set up n know wat1 are available for sure." The UC informed MATTHAEUS that the UC was currently traveling but would be returning to Milwaukee the following week. Directing the conversation to the Glock pistol that J. V. had previously offered to sell to the UC (through MATTHAEUS), the UC stated they believed the price of the firearm was too high and the UC believed installing a machine gun conversion device ("MCD") would be a cheaper alternative to a binary trigger. MATTHAEUS responded, "Yea I kinda feel saw way but he [J. V.] said to get that [binary trigger] put on like a extra [$]400-[$]500 but yea switch [MCD] just as gud right idk that's what he has now but stays getting plenty more I'm sure u will like or I can ask my other ppl too that lil 22 chop tight too but I'll see what else around."

67.     On August 27, 2023, MATTHAEUS messaged the UC on Facebook, sending a photograph of a Smith & Wesson M&P handgun, chambered in 9mm. *See* Figure 5. MATTHAEUS informed the UC that in addition to the Smith & Wesson pistol, MATTHAEUS had four additional firearms that he could sell to the UC. The UC informed MATTHAEUS that the UC would be interested in purchasing all of the firearms MATTHAEUS was offering to sell.



*Figure 5*
*Screenshot of Smith & Wesson pistol sent to the UC by MATTHAEUS via Facebook Messenger*

68.     On August 28, 2023, the UC informed MATTHAEUS that the UC could meet with MATTHAEUS on August 31, 2023, to conduct the firearms transaction upon the UC's return to Milwaukee during the upcoming week.

69.     On August 29, 2023, at approximately 5:19 p.m., MATTHAEUS messaged the UC on Facebook Messenger, stating MATTHAEUS would be able to sell the UC an additional firearm, described by MATTHAEUS to be one (1) "MP15 sport 2" (believed by agents to be an AR-style rifle). The UC, responding to MATTHAEUS, stated the UC would be interested in purchasing this firearm from MATTHAEUS in addition to the firearms offered by MATTHAEUS over the past several days.

31

70.     In an effort to clarify what firearms MATTHAEUS was offering to sell to the UC, the UC asked MATTHAEUS to summarize all of the firearms MATTHAEUS intended to sell the UC on August 31, 2023. MATTHAEUS stated he could sell the UC five firearms. MATTHAEUS then described each firearm and also included a price for each individualized item, totaling $4,500. After receiving the itemized breakdown from MATTHAEUS, the UC stated they would purchase all five firearms from MATTHAEUS on August 31, 2023.

71.     On August 31, 2023, beginning at approximately 10:00 a.m., the UC began communicating with MATTHAEUS via text message to coordinate and arrange the firearms transaction. Ultimately, the UC and MATTHAEUS agreed to meet later that day at the parking lot of Family Dollar, located at 749 S. Layton Avenue, Milwaukee, Wisconsin.

72.     At approximately 12:49 p.m., MATTHAEUS texted the UC, informing the UC that MATTHAEUS was waiting for the UC at 749 S. Layton Avenue. At approximately 12:50 p.m., the UC responded via text message, informing MATTHAEUS the UC would arrive at 749 S Layton Ave in approximately 10 to 15 minutes.

73.     At approximately 12:50 p.m., the UC departed the operation's staging location in a UCV. The UC was equipped with audio/video recording/transmitting equipment and an amount of ACF. Additionally, the UC was followed by a designated cover team during the entirety of the operation.

74.     At approximately 12:59 p.m., the UC arrived at 749 S. Layton Avenue. After entering the parking lot at 749 S. Layton Avenue, the UC called MATTHAEUS and informed him (MATTHAEUS) that the UC had arrived at the meet location. MATTHAEUS stated he had just observed the UC had pass him in the parking lot. MATTHAEUS then directed the UC to park the UCV in the lot and MATTHAEUS would join the UC in the UCV.

75.     The UC then parked the UCV on the east side of the parking lot and observed MATTHAEUS walking through the parking lot towards the UCV. At approximately 1:00 p.m., MATTHAEUS entered the front passenger seat of the UCV and exchanged greetings with the UC. MATTHAEUS explained that although he had originally offered to sell the UC at least five firearms, MATTHAEUS had only secured two of the firearms before the UC arrived. MATTHAEUS explained both firearms he had secured were with J. V., who was parked in a different vehicle in the same parking lot. MATTHAEUS then retrieved a small piece of paper containing a handwritten list, or a ledger, of firearms and their respective prices from his pocket and stated the two firearms J. V. possessed consisted of a Glock 19 pistol ($1350) and a .22 caliber pistol ($800). *See* Figure 6.



*Figure 6*
*Screenshot from the recordings capturing MATTHAEUS reviewing his firearms ledger.*

76.     MATTHAEUS asked the UC to provide him (MATTHAEUS) with $2,150 (total for the two firearms),which MATTHAEUS would use to pay J. V. The UC then stated they did not possess any dollar denominations less than $100; therefore, the UC was giving MATTHAEUS/J. V. $2,200.

77.     At approximately 1:04 p.m., MATTHAEUS took the $2,200 in ACF, walked a short distance west through the parking lot, and entered J. V.'s vehicle. Approximately three minutes later, MATTHAEUS returned to the UCV as he carried a black plastic bag that MATTHAEUS had not possessed prior to entering J. V.'s vehicle. After MATTHAEUS re-entered the front passenger seat of the UCV, MATTHAEUS produced two firearms—a Glock 9 mm pistol, Model: 19, bearing Serial No. BPNS947 and a CBC .22 caliber pistol, Model: 715P, bearing Serial No.: EMK3994708—from the black bag. Each firearm was accompanied by one compatible magazine.

34

78. After the UC had inspected the firearms, MATTHAEUS offered to bring the UC to an "alley" to "shoot" the firearms to ensure the firearms functioned properly. The UC declined MATTHAEUS' offer and stated the UC would contact MATTHAEUS if the UC found issue with either firearm.

79. MATTHAEUS then stated he had another cousin who could sell the UC a "shotgun" for $200. MATTHAEUS then explained that he believed he could potentially negotiate the price of the shotgun down to $150. MATTHAEUS also stated he had a photograph of the shotgun and proceeded to show the UC a photograph of a suspected short-barrel shotgun on MATTHAEUS' android cell phone. The UC stated they would purchase the firearm if MATTHAEUS' cousin could bring the firearm to 749 S. Layton Avenue. At approximately 1:21 p.m., MATTHAEUS, using his android cell phone, placed an outgoing call to his "cousin" and asked if they could bring the shotgun to MATTHAEUS and the UC. MATTHAEUS' cousin stated they were currently at work and would be unable to bring the firearm until later that day. The UC informed MATTHAEUS that the UC would discuss the purchase of this firearm at a later time as the UC had other business to tend to and could not wait for MATTHAEUS' cousin to finish their shift at work.

80. MATTHAEUS then asked the UC if they were interested in purchasing marijuana. MATTHAEUS explained he possessed "pounds" of "Cookies" (a brand of marijuana) at MATTHAEUS' residence. The UC stated they were not currently interested in purchasing an entire pound of marijuana, but stated they would be open to purchasing

35

one or two ounces. MATTHAEUS stated the marijuana he had advertised was pre-packaged in heat-sealed bags and he did not want to open any of the heat-sealed packaging. The UC stated they would decline purchasing marijuana on this date but would potentially be interested at a later time.

81.     The UC asked MATTHAEUS if he (MATTHAEUS) would allow the UC to come inside MATTHAEUS's residence to "hold" an Israel Weapon Industries (IWI) .50 caliber Desert Eagle pistol that MATTHAEUS previously claimed to jointly possess with his stepson. MATTHAEUS stated that the IWI Desert Eagle, along with all other firearms within MATTHAEUS's personal firearms collection were stored at MATTHAEUS's stepson's residence, which MATTHAEUS claimed to be located on Milwaukee's "northside."

82.     MATTHAEUS then disclosed that the only firearm MATTHAEUS kept at the **SUBJECT PREMISES** was a Glock 19 pistol. Notably, on July 5, 2023, and July 6, 2023, MATTHAEUS and the UC discussed their preferred choice of firearms via Facebook Messenger. On July 5, 2023, MATTHAEUS stated, "Yes I love the [Glock] 19, 22, 23." Continuing their conversation on July 6, 2023, MATTHAEUS stated, "I got a Glock 19, FN 45, [Glock] 43x, few tauruses plenty shit." MATTHAEUS also sent the UC a photograph of MATTHAEUS' Glock 19 pistol (*see* Figure 7) along with a message which stated, "My [Glock] 19 got a [laser] beam on it now tho."

36



*Figure 7*
*Screenshot of photograph sent to UC by MATTHAEUS on July 6, 2023, capturing MATTHAEUS' Glock 19 pistol beside a large amount of U.S. currency.*

83.     At approximately 1:23 p.m., The UC offered to give MATTHAEUS a ride back to MATTHAEUS' residence, the **SUBJECT PREMISES**, which MATTHAEUS accepted. The UC and MATTHAEUS then drove the short distance (approximately one block) to the **SUBJECT PREMISES**. After arriving at the residence, MATTHAEUS held a suspected marijuana cigarette ("joint") towards the UC and asked it the UC wanted to smoke the marijuana cigarette with MATTHAEUS. The UC declined MATTHAEUS' offer to smoke the suspected marijuana. MATTHAEUS then exited the UCV and walked towards the back door of the **SUBJECT PREMISES**. MATTHAEUS was observed by surveillance officers using keys to enter the rear door of the **SUBJECT PREMISES**.

## SUBJECT PREMISES

84.     According to a WE Energies representative, Renia Maldonado is the listed as the subscriber of utilities for the **SUBJECT PREMISES** since July of 2023. Case agents

believe that Maldonado is MATTHAEUS' girlfriend based upon publicly viewable Facebook information.

85.     The **SUBJECT PREMISES** is the lower unit of a two-story residence. The upper residence has an address of 2810 West National Avenue #A.  The **SUBJECT PREMISES**, or the lower unit, can be accessed by doors on the front and back of the residence. The door on the front of the residence faces South. There are two doors on the rear of the residence. If one is looking at the rear of the residence, the eastern most door (or the door to the left) is the access point for the **SUBJECT PREMISES**. This is the door case agents have observed MATTHAEUS entering with keys. Case agents know that the door MATTHAEUS has entered is the door to the lower unit—the **SUBJECT PREMISES**—based upon information obtained from a previous tenant of the **SUBJECT PREMISES**.

## TECHNICAL TERMS

86.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

38

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

70. As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

71. *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually

39

disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

72. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers,

40

e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when

41

the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a

42

means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

73. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

43

b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

74. *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

75. The warrant I am applying for would permit law enforcement to obtain from **MATTHAEUS** the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

44

76.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

77.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

78.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial

45

recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

79.     If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

80.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

81.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

82.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers,

46

that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

83.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of **MATTHAEUS** to the fingerprint scanner of the device; (2) hold the device in front of **MATTHAEUS'** face to activate the facial recognition feature; and/or (3) hold the device in front of **MATTHAEUS'** face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

47

## CONCLUSION

84.     Based upon the facts contained within this affidavit I believe there is probable cause for a warrant to search the **SUBJECT PREMISES** described in Attachment A and seize the items described in Attachment B.

## ATTACHMENT A

### Property to Be Searched

**2810 West National Avenue, Milwaukee, Wisconsin**, to include all associated common spaces, basement, garage, and outbuildings at this address. This address is further described as the lower residence of a two-story duplex, with the upper residence identified as 2810 West National Avenue #A. The residence is made up of tan siding with white trim. 2810 West National Avenue can be accessed by two doors. There is a door on the front of the residence that faces South. There are two doors on the rear of the residence. If one is looking at the rear of the residence, the eastern most door (or the door to the left) is the access point for 2810 West National Avenue. This is the door case agents have observed MATTHAEUS entering with keys.

 

1

<u>**ATTACHMENT B**</u>

Property to be seized

1.      Evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (Distribution of and possession with intent to distribute controlled substances), those violations involving Robert MATTHAEUS, including:

a.      Controlled substances, controlled substance analogues, or listed chemicals;

b.      Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

c.      Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

d.      Proceeds of drug and firearms trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

e.      Firearms, ammunition, magazines, gun boxes, firearm purchase records or receipts, ledgers, and other paraphernalia associated with firearms;

f.      Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances and firearms, or financial transactions related to the trafficking of controlled substances and firearms;

1

g.      Drug, firearms, or money ledgers, distribution or customer lists, supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances or firearms were obtained, transferred, sold, distributed, and/or concealed;

h.      Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug and firearms trafficking activities;

i.      Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

j.      Cellular telephones, Smartphones, text messaging systems, and other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug and firearms trafficking offenses;

k.      Records, items and documents reflecting travel for the purpose of participating in drug and firearms trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxicab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long-distance calls reflecting travel;

l.      Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

m.    Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances; and

2

2.      Computers, cellular telephones, or storage media used as a means to commit the violations described above;

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

  a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

  b. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

  c. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

  d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

  e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

  f. evidence of the times the COMPUTER was used;

  g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

  h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

3

i.      records of or information about Internet Protocol addresses used by the COMPUTER;

j.      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.      contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of MATTHAEUS to the fingerprint scanner of a device found

4

at the premises; and/or (2) hold a device found at the premises in front of MATTHAEUS'

face to activate the facial and/or iris recognition features, for the purpose of attempting

to unlock the device to search the contents as authorized by this warrant.